MARGARET A. HARRISON *et al.*, Executors, Appellants, v. CLARA A. LEGORE, HANNA H. SMITH *et al.*

**Payment to Agent:** AUTHORITY: *Burden of proof.* One paying money due on a mortgage to an agent, who has not the mortgage or the notes, or a satisfaction of them, has the burden of proving that such agent has authority to receive such payments.

PROOF OF AUTHORITY. One who received applications for loans for another, to whom such other sent money to loan, and who deposited the money on his own bank account, and paid it out after examining the title and papers, collected interest and principal and remitted it, is, as to one who knew of the course of business between them, an agent of the other, and payment of the principal of mortgage to him is a payment thereof though he does not have the mortgage note and satisfaction.

SAME. Where, on a prior occasion, the mortgagee wrote to the agent to accept a part of the mortgage debt before it was due, and it was paid and credited by plaintiff, the mortgagors were warranted in believing the agent was authorized to accept the balance before it was due.

**Payment in Cash:** WHAT IS. Where an agent of a mortgagee accepts a certificate of deposit in payment of a mortgage, and deposits it in a bank which issues it, to the credit of his own account therein, the transaction is equivalent to a payment in cash.

*Appeal from Greene District Court.*—HON. Z. A. CHURCH, Judge.

FRIDAY, OCTOBER 27, 1899.

ACTION to foreclose mortgage. The defendants pleaded payment. Petition dismissed, and the plaintiffs appeal.—*Affirmed.*

*Rose & Henderson* for appellants.

*Russell & Toliver* for appellees.

LADD, J.—The mortgage on which this action is based was executed by the defendants to the plaintiffs, October

15, 1888, for one thousand seven hundred dollars, due January 1, 1894, with the privilege of paying one hundred dollars, or any multiple thereof, when any interest coupon fell due. This appears to have been on the 1st of July and January of each year. On May 9, 1892, Harrison, who conducted the business of the executors, wrote concerning this loan to A. M. Head: "We will release the 80 acres of Smith on payment of three hundred dollars or more;" and on 18th day of October, 1892, three hundred dollars on principal and five dollars and fifty cents accrued interest thereon was paid to Head, for which the plaintiffs gave credit. On July 5, 1893, the defendants, through Legore, paid the balance of the mortgage, one thousand four hundred and forty-three dollars and ninety-two cents, to Head, who failed to forward it to the plaintiffs. This was by assigning to him a certificate of deposit in the Greene County State Bank of one thousand two hundred dollars, payable on demand, and handing him the difference in cash. At that time there was money to Head's credit in the bank. He held the certificate till July 14th, but in the meantime had overdrawn his account several hundred dollars. That day he presented it for payment, and received credit for the full amount on the books of the bank. This was precisely the same as though he had drawn the money, and then deposited it to his credit. If that had been done, it could have been claimed by no one that he had not been paid in money. But such an idle ceremony would have added nothing to the transaction had which was equivalent to payment in cash. *Hare v. Bailey,* 73 Minn. 409 (76 N. W. Rep. 213); *Harbach v. Calvin,* 73 Iowa, 640.

II. But was Head authorized by the mortgagees to receive this payment? The executors, as will be seen, are mistaken in saying he was their agent for no purpose whatever. Their testimony, in this respect, is important only as excluding the possibility of an oral arrangement between

them and Head; otherwise, his relation to them must be determined from their course of dealing and correspondence. *Bradstreet Co. v. Gill,* 72 Tex. 115 (9 S. W. Rep. 753). For many years prior to 1887, Mahlon Head had been the trusted agent of George Harrison, of Albany, N. Y., in loaning and collecting money for him. That year the business was transferred to A. M. Head, and in the following year Harrison died. His executors continued to negotiate loans through A. M. Head, until his death, in 1894. During that time he had forwarded to them applications of borrowers, which were accepted, amounting to more than thirty thousand dollars, on which money was sent to him by draft, which he deposited in the bank in his own name, and paid the borrowers therefrom by his checks, upon the execution of proper securities. It was his duty to see that the papers were properly executed, that the titles were perfect, and that the mortgages were first liens on the hypothecated real estate, before turning the money over to the borrowers. In these matters he was the agent of the executors. He was also their agent in bidding in lands mortgaged to them, at tax sales, on which taxes had not been paid, and in renting and finding a purchaser for a piece of land on which he procured title for them in foreclosure proceedings while acting as their attorney. All the money collected by them on these loans in Greene county, amounting to thifty-four thousand two hundred and fifty-four dollars principal and fifteen thousand seven hundred and two dollars and sixty-three cents interest, was paid to Head, and by him forwarded to them. Often, before remitting, he retained the money received several weeks or months, until it aggregated a large sum. To this practice no objection was made. Sometimes notes and coupons were forwarded to him for collection; but more frequently payments were made to him, and sent to the executors. When only in part payment, receipts were returned to him; and when in full, the papers and releases. The executors never

took occasion to warn any of the borrowers that Head was not acting as their agent. On the contrary, Harrison frequently urged him to greater diligence in obtaining interest payments. Thus, on September 17, 1891, he wrote: "There is a considerable number of coupons overdue on your loans, and you have remitted nothing in several months. If you do not care to continue our business, you should say so, and not compel us to write disagreeable letters every time we feel it necessary to hear from you." Again, on April 25, 1893: "I sent you a list of unpaid coupons some time ago, and will repeat it now. * * * We would like to have all these collected as soon as possible." Nearly a dozen similar letters were written. As other letters mention inclosure of coupons, it is only fair to infer they were not inclosed in these, and this is in accord with Harrison's testimony. The collection of the principal on several notes was expressly authorized. December 19, 1892, Harrison wrote: "We do not care to make the Brock loan of $1,800 unless he will include the other 40 acres in the mortgage. If he does not want to do so, you may collect the loan." Again, October 12, 1893: "We prefer not to renew the George W. Hall loan, and would like to have it collected as soon as possible." October 11, 1892: "We do not care to renew the Nugent $500 and Tracy $700 loans, and would like to have them paid as soon as possible." There was no disapproval of his action in collecting money. July 18, 1892: "Some weeks ago you wrote that you had collected some moneys for us, and would remit in a day or two. Have heard nothing from you since. ' * * * I desire to hear from you at once in these matters." It has not been our purpose to set out any considerable portion of the correspondence, but only enough to indicate the general course of business between them. We should add that the payment on the mortgage in suit was made on the advice of J. R. Smith, son of one of the mortgagors and brother of the other, who had been engaged in Head's

office as clerk or law partner, and was informed of the course of dealing between him and the plaintiffs. They may, then, be assumed to have acted with his knowledge; and the question arises whether, as persons of ordinary prudence, they were justified in treating Head as an agent of the mortgagees, authorized to receive payment of the balance due. As he did not have the papers in his possession, the burden of proof is undoubtedly on the defendants to show such authority, actual or implied. *Security Co. v. Graybeal,* 85 Iowa, 549; *Richards v. Waller,* 49 Neb. 639 (68 N. W. Rep. 1053). "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." *Quinn v. Dresbach,* 75 Cal. 159 (16 Pac. Rep. 763); *Thompson v. Shelton,* 49 Neb. 644 (68 N. W. Rep. 1055). The rule seems to be based on the maxim that, where one of two innocent persons must suffer, it should be that one who misled the other to his prejudice, and appears to be founded on the principle of equitable estoppel. It is thus perspicuously stated with approval by Irvine C., in *Johnston v. Investment Co.,* 46 Neb. 480 (64 N. W. Rep. 1100): "Where a principal has, by his voluntary act, placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform, on behalf of his principal, a particular act, such particular act having been performed, the principal is estopped, as against such innocent third person, from denying the agent's authority to perform it." See, to same effect, *Holt v. Schneider,* 57 Neb. 523 (77 N.W. Rep. 1086); *Reid v. Kellogg,* 8 S. D. 596 (67 N. W. Rep. 687); 1 Am. & Eng. Enc. Law (2d ed), 1002; *Klindt v. Higgins,* 95 Iowa, 534; *Kasson v. Noltner,* 43 Wis. 650. Concededly, Head was the agent of its executors in many respects in making their loans, and the record conclusively shows that they looked to him to procure

payment of interest coupons and many of the principal notes, without having them in his keeping, and regardless of the fact that these were payable in New York. Every dollar received had come through him,—generally before the papers had been sent,—and they repeatedly scolded him for not giving prompt attention to their business. What was this business to which they so often referred? Collecting the money due them, and remitting that already collected. Surely they approved what he had been doing, and warranted the inference that they expected him to continue making collections as he had done before. They had dealt with him as their agent, to collect and receive payment of interest and principal, and, by failing to object, had approved of his course. Those who had knowledge of their course of dealing were fully warranted in assuming that Head was authorized to receive payment on loans made through him.

III. But it is contended that, even though there might have been authority to receive payment of mortgage loans which had matured, it did not exist as to this one, since it was not due, nor was payment made at a time when the mortgagees were required to exercise their option of paying one hundred dollars or multiple thereof. True, the payment was made four deys after the interest coupon matured; but the mortgagees, in their letter of October 18, 1892, had clearly intimated their willingness to receive more than the three hundred dollars on the debt before its maturity, and had approved Head's act in receiving that sum three months and twenty days after interest pay day. It has been held that ostensible authority may be conferred by the recognition of a single act of the agent, if sufficiently unequivocal. *Wilcox v. Railway Co.,* 24 Minn. 270; *Quinn v. Dresbach, supra.* In view of the correspondence concerning the payment of this mortgage, the approval of the act of Head in receiving the previous payment of three hundred dollars before maturity, and at a

time when the mortgagors might not insist on their option to pay, and the general course of dealing between the executors and Head, we are of opinion that the defendants had the right to believe Head was fully authorized to act for the plaintiffs in receiving payment. From our conclusion that Head had ostensible authority to act for the plaintiffs, it must not be inferred that we hold he did not have actual authority. We reach our conclusion without considering that proposition. The decree of the district court was right, and it is AFFIRMED.